## UNITED STATES DISTRICT COURT
## DISTRICT OF COLORADO

| | |
|---|---|
| JACK WELLER, GLADYS WOODEN, and MATT WOODEN, individually and on behalf of all others similarly situated,<br><br>     Plaintiffs,<br><br>     v.<br><br>HSBC MORTGAGES SERVICES, INC., ASSURANT, INC., AMERICAN SECURITY INSURANCE COMPANY, and JOHN DOES 1-10,<br><br>     Defendants. | Civil Action No. _____<br><br><br>**CLASS ACTION COMPLAINT**<br><br>JURY TRIAL DEMANDED |

## INTRODUCTION

1.      Plaintiffs Jack Weller, Gladys Wooden and Matt Wooden (referred to herein collectively as "Plaintiffs"), individually and on behalf of all others similarly situated, bring this Class Action Complaint against Defendants HSBC Mortgage Services, Inc. ("HSBC Mortgage Services") and HSBC Insurance Company of Delaware ("HSBC Insurance"), (collectively, "HSBC" or "HSBC Defendants"), Assurant Inc. ("Assurant, Inc.") and American Security Insurance Company ("ASIC") (collectively "Assurant" or "Assurant Defendants") (Assurant Defendants, together with the HSBC Defendants, "Defendants") in connection with Defendants' unlawful force-placed flood insurance practices.

2.      First, Plaintiffs challenge HSBC's decision to purchase force-placed flood insurance from the Assurant Defendants pursuant to agreements that return an improper financial benefit to Defendants and/or their subsidiaries/affiliates that is unrelated to any contractual or other *bona fide* interest in protecting the lender's interest in the loan. To perpetuate this scheme, HSBC has entered into agreements with the Assurant Defendants pursuant to which HSBC and/or its subsidiaries/affiliates:  (a) receive a portion of the premiums for each force-placed

insurance policy purchased for a borrower through fees, payments, commissions and/or other things of value from providers of force-placed insurance; (b) assume a portion of the force-placed insurance policies originally written by force-placed insurance providers through reinsurance contracts that do not actually or commensurately transfer risk; and/or (c) receive services in kind and other kickbacks.

3.      Second, throughout the Class Period, Defendants have unlawfully profited from force-placing flood insurance on Plaintiffs' properties and the properties of Class members by forcing Plaintiffs and Class members to purchase and maintain flood insurance in amounts greater than required by law, greater than required by their written mortgage agreements, and/or greater than the lenders' financial interest in their properties.

4.      Third, throughout the Class Period, Defendants have further engaged in unlawful, abusive and unfair practices with respect to force-placed flood insurance by improperly backdating flood insurance policies to cover periods for which there is no risk of loss.

5.      In this action, Plaintiffs do not challenge the rates of their force-placed flood insurance as excessive. Rather, Plaintiffs challenge, among other things, HSBC's *decision to purchase* force-placed flood insurance from insurers that provide an improper financial benefit to Defendants and/or their affiliates and at rates that far exceed borrower-purchased flood insurance (while providing substantially less coverage), and other actions taken by Defendants to increase the number of properties force-placed and to increase coverage amounts, and seek statutory and compensatory damages, as well as restitution/disgorgement of Defendants' unjust enrichment.

## PARTIES

**Plaintiffs**

Plaintiff Jack Weller

6.      On or about November 17, 2006, plaintiff Jack Weller ("Weller") refinanced a home mortgage loan with HSBC Mortgage Corp. for property located at 778 S. Depew St., Lakewood, Colorado ("Weller Property") in the amount of $200,000 ("Weller Mortgage"). *See* Weller Mortgage, attached as Exhibit 1 hereto.

7.      Upon information and belief, at all times relevant to this complaint, the Weller Mortgage was serviced by HSBC Mortgage Services.

Plaintiffs Matt and Gladys Wooden

8.      Plaintiffs Matt and Gladys Wooden ("Woodens") executed a Deed of Trust with Metro Center Mortgage ("Metro") on or about October 31, 2003, in connection with their property located at 1511 Forest Cove Dr., Chesapeake, Virginia 23323 ("Wooden Property") in the amount of $100,500 ("Wooden Mortgage"). *See* Wooden Mortgage, attached hereto as Exhibit 2. On or about May 1, 2012, the Wooden Mortgage was assigned to Household Realty Corp. *See* Exhibit 3 ("Wooden Assignment").

9.      Upon information and belief, at all times relevant to this complaint, the Wooden Mortgage was serviced by HSBC Mortgage Services.

**Defendants**

10.     Defendant HSBC Mortgage Services, a leading mortgage provider[1], is a Delaware corporation with its principal place of business located, upon information and belief, in Fort Mill,

---

[1]     *See* HSBC Mortgage Services "About Us," available at:
 https://www. hsbcmortgageservices.com/about_us_display (last accessed on Jan. 25, 2013).

South Carolina. *See* http://investing.businessweek.com/research/stocks/private/snapshot.asp?
privcapId=21913926 (last accessed on Jan. 25, 2013). HSBC Mortgage Services is a subsidiary
of HSBC Finance Corp.[2] (f/k/a Household International, Inc.).

    11.    Defendant Assurant, Inc. is a Delaware corporation which is headquartered at One
Chase Manhattan Plaza, New York, New York 10005. According to its website, Assurant, Inc.
is a provider of specialized insurance products including "lender-placed" homeowners insurance
or FPI. *See* About Us, http://www.assurant.com/about/ (last accessed Jan. 25, 2013). According
to Assurant, Inc.'s 2010 Annual Report as filed with the Securities and Exchange Commission
("SEC") on SEC Form 10-K, "the majority of [Assurant Inc.'s] lender-placed agreements are
exclusive" and those agreements require the Assurant Defendants to "automatically issue these
policies when a borrower's insurance coverage is not maintained." Assurant, Inc. has four
operating segments – Assurant Solutions, Assurant Specialty Property, Assurant Health, and
Assurant Employee Benefits.

    12.    Defendant ASIC is an insurance company writing force-placed insurance policies
in all fifty states and the District of Columbia with its principal address in Atlanta, Georgia.
ASIC is a wholly owned subsidiary of Interfinancial, Inc., which in turn is a wholly owned
subsidiary of Assurant, Inc. ASIC is one of Assurant Inc.'s exclusive force-placed insurance
providers. Upon information and belief, ASIC sometimes operates under the trade names
Assurant Solutions and Assurant Specialty Property. On information and belief, ASIC contracts
with HSBC whereby it acts as a force-placed insurance vendor. On information and belief, its
duties include, but are not limited to, tracking loans in HSBC's mortgage portfolio, handling all

---

[2]    *See* HSBC Finance Corporation 2011 Form 10-K, dated February 27, 2012.

4

customer service duties related to force-placed insurance, and securing force-placed insurance policies on properties when a borrower's insurance has lapsed.[3]

## JURISDICTION AND VENUE

13.     This Court has jurisdiction over the subject matter of this action pursuant to 18 U.S.C. §§ 1961, 1962 and 1964.  This Court also has original diversity jurisdiction pursuant to the Class Action Fairness Act, 28 U.S.C. § 1332(d)(2) ("CAFA"), given that Plaintiffs are citizens of different states, Defendants are citizens of different states, there are more than 100 Members in the Class, and the amount in controversy in this action exceeds $5,000,000.

14.     This Court also has supplemental jurisdiction over Plaintiffs' state law claims pursuant to 28 U.S.C. § 1367.

15.     Venue is proper in this district under 28 U.S.C. § 1391(b) because Defendants regularly conduct business in this district, Plaintiff Jack Weller's property is located in this district, and/or because a substantial part of the events giving rise to the claims occurred in this district.

## FACTUAL ALLEGATIONS

### Force-Placed Insurance

16.     In order to protect the mortgagee's interest in the secured property, mortgage loan contracts typically allow the lender or third party servicer to "force-place" insurance when the borrower fails to maintain the insurance.  Plaintiffs' and the Members of the Classes' mortgage loan contracts contain such provisions affording the lender authority to force-place insurance in the event of a lapse.  The failure of a borrower to maintain insurance is clearly contemplated by

---

[3]     Plaintiffs reserve all rights to add additional defendants at a later time should discovery reveal it to be appropriate.

the mortgage contract and such a failure by the borrower does not result in a material failure to perform under the mortgage contract.

17.     This discretion afforded to force place insurance, however, is limited by the bounds of reasonable conduct and by the express terms of the mortgage contract itself. Defendants routinely exceed the bounds of reasonableness and the spirit, intent and letter of the mortgage contract itself by force-placing insurance in a manner and in amounts that are not required in an effort to reap profits from the borrower which are not required nor contemplated by the mortgage contract and through other conduct described herein with respect to the forced placement of insurance.

18.     These lender-placed or "force-placed" insurance policies are almost always more expensive than standard insurance coverage. Reportedly, such policies can cost as much as ten times more than standard policies. While the force-placed insurance policy is for the benefit of the lender, the cost is passed on to the borrower. *See* Jeff Horowitz, *Ties to Insurers Could Land Mortgage Servicers in More Trouble* (referred to herein as "Ties to Insurers"), American Banker (November 10, 2010).

### Mortgage Loan Servicers Commonly Have Undisclosed Lucrative Pre-Arranged Agreements to Refer Borrowers to Certain Force-Placed Insurance Providers

19.     The force-placing of insurance policies can be a very lucrative business for lenders and servicers. Commonly, the lender and/or servicer selects the force-placed insurance provider in accordance with a pre-arranged agreement and force-places the policy in such a way as to receive a financial benefit for the provider. The lender and/or servicer benefit by placing the policy either: (a) with an affiliate or (b) with a third party provider who has already agreed to share revenue with the lender and/or servicer in the form a commission payment or through a

6

"captive reinsurance agreement" whereby "reinsurance" premiums are ceded to a subsidiary of the lender and/or servicer.

20.     Under the commission arrangement, the provider of the force-placed insurance policy pays a commission either directly to the lender and/or servicer or to an affiliate posing as an insurance "agent."   Typically, under such an arrangement, commissions are paid to a "licensed insurance agency" that is simply an affiliate or subsidiary of the lender and/or servicer and exists only to collect the kickbacks or commissions collected from the force-placed insurance provider.

21.     Under the captive reinsurance arrangement, the provider of the force-placed insurance policy agrees to "reinsure" the force-placed insurance policy with a subsidiary or "captive reinsurer" of the referring lender and/or servicer.   In return for the subsidiary purportedly agreeing to assume a portion of the insurer's risk of loss, the insurer cedes to the subsidiary a portion of the premiums received on account of the policy.  For example, Assurant, the nation's largest provider of force-placed insurance with multiple subsidiaries, including those, as hereinabove alleged, for whom Defendants produce force-placed insurance policies, has acknowledged that its force-placed insurance division "write[s] business produced by clients, such as mortgage lenders and servicers and financial institutions, and reinsures all or a portion of such business to insurance subsidiaries of the clients." *See* Assurant, Inc. Annual Report (Form 10-K), at 81 (February 25, 2010).

22.     Illustrative of the typical kickback arrangements is the following graphic from American Banker:

# Sharing in the Profits

How servicers make money arranging force-placed coverage

## Commissions

**To replace lapsed homeowners coverage, the servicer, working through a subsidiary, buys policy from insurer**

**Servicer advances premiums to insurer**

**Insurer pays portion of premium back to subsidiary as a commission**

**Servicer bills borrower for the policy**

**If borrower defaults, cost of insurance is subtracted from proceeds to investors from foreclosure sale**





## Reinsurance

**To replace lapsed coverage, servicer buys policy on home from insurer**

**Servicer advances premiums to insurer**

**Subsidiary of servicer reinsures part of the policy, gets a cut of premiums**

**If necessary, subsidiary buys letter of credit from another party**

**Servicer bills borrower for the policy**

**If borrower defaults, cost of insurance is subtracted from proceeds to investors from foreclosure sale**

23.     J. Robert Hunter of the Consumer Federation described these practices in his testimony before the New York Financial Services Department in connection with the Department's inquiry into force-placed insurance practices:

> In some instances, lenders use [force-placed] insurance as a profit center by collecting commissions from insurers through lender-affiliated agents or broker or by receiving below-cost or free services (such as tracking of loans) from insurers, and/or using "fronting" primary insurers to direct the coverage to lender-affiliated captive reinsurers. Lenders often receive free or below cost service from affiliated service providers.

*See* J. Robert Hunter, Consumer Federation of America, Testimony Before New NYDFS on Force-Placed Insurance (May 17, 2012) ("Hunter NYDFS Testimony") at 1.

8

24.     Indeed, as Birny Birnbaum of the Center for Economic Justice, another experienced and noted expert in the area of force-placed insurance stated:

> Servicers have financial incentives to force-place the insurance because the premiums include commissions and other considerations for the servicer. With some servicers, the insurance is reinsured through captive reinsurer of the servicer, resulting in additional revenue to the servicer from the force-placement coverage.

*See* Birny Birnbaum, Center for Economic Justice, Testimony Before New NYDFS on Force-Placed Insurance (May 21, 2012) ("Birnbaum NYDFS Testimony") at 15.

25.     Borrowers have no say or input into the carrier or terms of the force-placed insurance policies. The terms and conditions of the insurance policy, as well as the cost of the policy, are determined by the lender and/or servicer and the insurer, rather than negotiated between the borrower and the insurer. *Id.*; *see also* Hunter NYDFS Testimony at 10.

26.     For their part, lenders and/or servicers have no incentive to comparison shop for the best rate. Rather, lenders and/or servicers are financially motivated to refer borrowers to the provider that will provide the best financial benefit to the lender and/or servicer in terms of commission and/or ceded reinsurance premiums that are established as part of the secret arrangements and profit-making scheme established by providers and affiliates. Further, because the servicer's "commission" and/or reinsurance premium is usually related to the size of the policy, the servicer actually has an incentive to purchase the highest price insurance, an interest diametrically opposed to that of the borrower. *See, e.g.,* Hunter NYDFS Testimony at 1.

27.     Commonly, a mortgage loan servicer enters into an agreement with a provider, pursuant to which it refers borrowers exclusively to the provider for force-placed insurance. For example, in its public filings, Assurant—the nation's largest provider of force-placed insurance policies and the parent of ASIC and other subsidiaries with whom Defendants force-place

insurance—states that it establishes "long-term relationships" with leading lenders and servicers and that the majority of its lender-placed agreements are exclusive. *See* Assurant, Inc. Amended 2010 Form 10-K, at 5 (February 25, 2011) ("The majority of our lender-placed agreements are exclusive.").

28.     Additionally, servicers often go so far as to actually outsource their insurance tracking and processing to the force-placed insurance provider.  The provider then continuously monitors the lender's and/or servicer's mortgage portfolio and verifies the existence (or lack of) of insurance on each mortgaged property.  In the event that borrowers do not maintain adequate insurance coverage, the insurer promptly issues an insurance certificate on the property on behalf and for the benefit of the lender and/or servicer.  Thus, where these lenders and/or servicers receive commissions from force-placed insurance providers (which are ultimately charged to borrowers), they are performing no service for the commissions they receive other than simply providing the referral. *See* Ties to Insurers.

29.     John Frobose, President of ASIC confirmed this practice, acknowledging that "ASIC monitors policy status for possible lapses in coverage, such as when a homeowner's standard policy has been cancelled or is about to expire." *See* John Frobose, President of ASIC, Written Testimony in Response to April 12, 2012 NYDFS Notice of Public Hearings ("Frobose NYDFS Testimony").

30.     Indeed, during his testimony before the Property and Casualty Insurance and the Market Regulation and Consumer Affairs Committees at the 2012 NAIC Summer National Meeting on August 9, 2012, Joseph Markowicz of PRP Claims – an organization that proclaims claims to have been "Bridging the Lending and Insurance Communities, since 1992" – recognized that FPI premiums include not just the risk incurred but also "administrative costs

undertaken by the LPI carrier on the lenders behalf, that are bundled into the costs of the premium" which in turn are passed on to "the general public." *See* Joseph Markowicz, PRP Claims, NAIC Testimony (Aug. 9, 2012). Thus, in return for purchasing higher-priced FPI, insurers such as the Assurant Defendants provide kickbacks to lenders in the form of services in kind, the cost of which is ultimately borne by the mortgagee.

### Forced Placed Insurance Policies are Expensive Because they Include Imbedded Kickbacks, Not Because of a Lack of Underwriting

31.     Force-placed insurance policies are not underwritten on an individual policy basis. Rather, servicers' contracts with force-placed insurance providers such as the Assurant Defendants require or at least permit the insurer to automatically issue these policies when a borrower's insurance coverage is not maintained.

32.     As J. Robert Hunter in his recent testimony before the New York Financial Services Department argued, "lack of underwriting should also result in much lower acquisition expenses for FPI insurers, since no sales force is required to place the insurance." *See* Hunter NYFSD Testimony at 5. The lack of individual underwriting does not result in lower priced for consumers; quite to the contrary, actually. Instead, as a result of the schemes described herein between the banks and servicers, consumers are gouged.

33.     Servicers commonly attempt to justify the high price of force-placed insurance policies by pointing to the higher risk associated with the lack of individual policy underwriting. However, as *American Banker* noted:

> Though part of the extra expense can be explained by the higher risks associated with insuring the homes of delinquent borrowers, force-placed policies generate profit margins unheard of elsewhere in the insurance industry—even after accounting for the generous commissions and other payments that servicers demand.

*See* Jeff Horwitz, *Attorneys General Draw a Bead on Banks' Force-Placed Insurance Policies*,

American Banker (Mar. 10, 2011, 12:25 PM).

34.     However, force-placed insurance providers have tools to assess risk and minimize unexpected risk of loss.  As stated succinctly in January of 2007 by industry insider John Meadows, "Leveraging technologies and data elements that are available in most servicer's systems, an innovative lender-placed carrier can offer products that take into account relevant property-specific risk characteristics to determine premium rates."  *See* John Meadows, "*Evaluate Processes and Controls to Ensure Insurance Efficiencies*," Servicing Management, January 2007.

35.     As Birny Birnbaum of the Center for Economic Justice testified, servicer claims that the high cost of force-placed insurance are caused by lack of individual underwriting are "unsupported by any evidence." *See* Birnbaum NYDFS Testimony at 1.  A central indicator of the level of risk incurred in a line of insurance is a "loss ratio."  Simply put, a loss ratio is a comparison to the amount of money taken in premiums compared to the amount of money paid out on claims.  Loss ratios for FPI have been historically very low, especially when compared to traditional homeowner policies.

36.     Moreover, because the policies are not individually underwritten, the force-placed insurer is spared the costs associated with individual underwriting.  *Id.* at 26.

**The National Flood Insurance Program and Regulation**

37.     The purpose of the federal National Flood Insurance Program ("NFIP") is to provide disaster relief to flood prone areas by establishing a federal flood insurance scheme.  The federal agencies tasked with implementing the NFIP include the Federal Emergency Management Agency ("FEMA"), which proscribes the limits on how much flood insurance coverage a homeowner is required to maintain and how much the insurance policy will pay in the event of a loss.

38.    In the 1994 Amendments to the National Flood Insurance Act of 1968, 42 U.S.C. § 4001, *et seq.* ("NFIA"), Congress required lenders to ensure that homeowners had flood insurance for property located in areas designated by FEMA as Special Flood Hazard Areas ("SFHAs"). Lenders are required to ensure that properties in SFHAs pledged as security for loans have flood insurance equal to the ***lesser*** of:  (1) the maximum insurance coverage available through the NFIP, which is $250,000 per unit; (2) the outstanding balance of the loan; or (3) the replacement cost of the property.

39.    NFIA also forbids the collection of commissions and other payments in connection with force placed flood insurance, as NFIA only allows lender and servicers to "charge the borrower for the cost of premiums and fees *incurred* by the lender or servicer for the loan in purchasing the insurance."  42 U.S.C. 4012(e)(2) (emphasis added); *see also* 12 C.F.R. § 22.3.

40.    Similarly, Fannie Mae and Freddie Mac provide the banks they engage to service their mortgage portfolios with guidelines on Fannie Mae and Freddie Mac's flood insurance requirements. *See* https://www.efanniemae.com/sf/guides/ssg/svcg/svc061011.pdf (last accessed Jan. 25, 2013); *see also* http://www.allregs.com/tpl/Main.aspx.   Since at least 1997, these Fannie/Freddie guidelines are satisfied if the borrower maintains flood insurance coverage equal to the federal requirements.

41.    HSBC Mortgage Services, as loan servicer, is obligated to abide by Fannie Mae's and Freddie Mac's guidelines for loan servicing and, as the Lender/loan holder's assignee of certain servicing rights and obligations under the mortgage, may only impose the Lender/loan holder's requirements for flood insurance to protect the Lender/loan holder's interests, not to instead impose its own guidelines or requirements to benefit itself.

42.     Loan servicers profit from servicing loans by extracting payments for themselves or their affiliates, in addition to the principal and interest payments that are due to the lender. In reality, HSBC's stake in the outcome of the loan, as the loan servicer, is to generate as much fee income for itself over the life of its servicing relationship, including excessive premium income, kickbacks, commissions, late fees and if the force-placed insurance can lead to default or modification of the loan, the significant fees that it can collect in those situations.

43.     Furthermore, as servicer, HSBC suffers no consequences if its force-placed flood insurance scheme forces borrowers into foreclosure since that loss is borne by the owner of the loans, which upon information and belief, in Plaintiffs' instance is Fannie Mae.

44.     HSBC is without contractual discretion to set flood insurance coverage requirements. Instead, HSBC, as the loan servicer and assignee of the Lender/loan holders servicing rights and obligations only, is bound to enforce the requirements of federal law and the guidelines set by the lender.

45.     As demonstrated herein, Defendants have engaged in a scheme to generate additional fees and income for themselves by requiring borrowers to purchase additional flood insurance in excess of the requirements under the NFIP, the mortgage agreements, and Fannie Mae/Freddie Mac's guidelines. Through this practice, HSBC generates significant additional income for itself through, *inter alia,* commissions, kickbacks, reinsurance, in-kind payments, and other fees.

46.     Moreover, the additional insurance that HSBC force-places is excessive and unnecessary particularly when the outstanding balance on the mortgage is less than the purported replacement value of the property. Even if the lender provided HSBC with the discretion to set flood insurance requirements (and it did not), the lender has no interest in the insurance policy's

excess *coverage over* the amount of the loan balance. There is no good faith basis for a lender (or servicer) to force-place coverage that exceeds the lender's interest in the property, and interferes with and harms the borrower's ability to pay off the loan.

47.     HSBC also misrepresents to its customers that federal law and/or the customers' loan contracts require HSBC to obtain flood insurance in amounts, and time periods, dictated by HSBC.

48.     Undeterred by the requirements of federal law and Fannie Mae/Freddie Mac, HSBC, acting in its capacity as servicer for the Lender/loan holder, forces homeowners to purchase flood insurance coverage that exceeds the required to protect the owner's (usually Fannie Mae or Freddie Mac) interest in the property thereby breaching the underlying mortgage contracts.

## HSBC's Force-Placed Insurance Operations

49.     Plaintiffs and class members currently have or formerly had mortgage loans secured by their real property serviced by HSBC. As described herein, HSBC has engaged in an illegal scheme to impose its own flood insurance requirements on loans that it services, including Plaintiffs' loans, and mandates excessive, unauthorized and unnecessary flood insurance coverage with high premiums. Specifically, HSBC requires borrowers whose loans it services to purchase flood insurance in excess of that required: (a) by federal law; (b) by the borrowers' mortgage agreements; and/or (c) to protect the lender's insurable interest in the collateral (*i.e.*, the unpaid principal loan balance).

50.     HSBC Mortgage Services is a subsidiary of HSBC North America, which describes itself as "one of the top 10 financial services companies in the United States with assets approaching $300 billion." *See* http://www.hsbcmortgageservices.com/about_us_display (last accessed Jan. 25, 2013). HSBC North America includes all of the North American businesses of

15

British parent HSBC Holdings plc. *Id.* HSBC Mortgage Services' participation in the challenged profiteering scheme and the conduct alleged herein benefits its common corporate parent, HSBC North America, and the shared interests of the parent and the Defendant subsidiaries.

51.    Upon information and belief HSBC Mortgage Services force-places insurance policies through the Assurant Defendants,[4] and outsources insurance tracking, monitoring and processing to the Assurant Defendants. *See* Report on Examination of the HSBC Insurance Company of Delaware as of December 31, 2009 (referenced herein as the "Examination Report"), at 15. Upon information and belief, the cost of insurance tracking, monitoring and processing HSBC's mortgage portfolio is passed on by Defendants to the small percentage of homeowners whose insurance is force-placed.

52.    Additionally, upon information and belief, the Assurant Defendants entered into agreements with HSBC whereby Assurant purchased reinsurance from an HSBC subsidiary, namely the HSBC Insurance Company of Delaware.[5] According to its June 30, 2011 quarterly statement filed with the National Association of Insurance Commissioners ("NAIC"), during 2008, HSBC Insurance Company of Delaware entered into a quota share reinsurance agreement with one or more of the Assurant Defendants resulting in the assumption of lender-placed insurance from ASIC and another Assurant subsidiary, Standard Guaranty Insurance Company. *See* HSBC Insurance Company of Delaware NAIC Quarterly Statement dated June 30, 2011, at 6.3.

---

[4]    *See* Assurant, Inc. Amended 2010 Form 10-K, Exhibit 21, dated February 25, 2011.

[5]    HSBC Insurance Company of Delaware is a subsidiary of HSBC Finance Corp. *See* Exhibit 21 to HSBC Finance Corp. 2010 Form 10-K, dated February 28, 2011.

53.     The HSBC Insurance Company of Delaware further disclosed in its Annual Statement for the year 2011:

> During 2008, [HSBC Insurance Company of Delaware] entered into an agreement the Assurant Group resulting in the assumption of lender placed insurance from American Security and Standard Guaranty Insurance Company. In 2011, the Company entered into a new 50% reinsurance agreement with no backed commissions as opposed to the 20% reinsurance earned in the prior year on this business. The Company also purchased catastrophe coverage on this business from HSBC Reinsurance, LTD.

*See* Annual Statement for the Year 2011, HSBC Insurance Co. of Delaware, Management Discussion and Analysis, (Dec. 31, 2011).

54.     Moreover, upon information and belief, during the class period HSBC has received kickbacks from the Assurant Defendants through commissions paid to HSBC and/or HSBC affiliates and subsidiaries in connection with the force-placement of flood insurance. *See id.*

55.     As described herein, the cost of these kickbacks to HSBC through sham reinsurance agreements, commissions, subsidized portfolio monitoring and other payments were unlawfully passed onto Plaintiffs and the Class through amounts charged to borrowers by HSBC for force placed flood insurance.

**Defendants Charged Plaintiffs for Redundant or Otherwise Unnecessary Insurance Pursuant to Lucrative Pre-Arranged Agreements**

Jack Weller

56.     On or around November 17, 2006, Weller obtained a loan from HSBC Mortgage Services.  At closing, HSBC Mortgage Services provided Weller with a "Flood Insurance Acknowledgement" in which it acknowledged:  "This institution now deems **JACK A WELLER** waived from maintaining flood insurance coverage, on the basis of the Federal Insurance Administration's latest map now in effect for **LAKEWOOD, CITY OF** effective **06-**

17

**17-03** which in our judgment excludes the property in question from an identified special flood hazard area." *See* Ex. 4 (bold and underline in original).

57.     In or around December 2009, HSBC contacted Weller and, in contravention of its previous determination that the Weller Property was not located in a special flood hazard area, informed Weller that he was now required to maintain flood insurance.

58.     Weller protested, but HSBC would not acknowledge that it had previously indicated that flood insurance was not required.  Thus, Weller purchased a flood policy from Lloyds of London covering the period from December 11, 2009 to December 11, 2010 ("Lloyds Policy").  The Lloyds Policy had an annual premium of $866.23 and provided $190,000 of coverage for the building, with an additional $19,000 of coverage each for appurtenant structures, contents, and loss of use. *See* Ex. 5.

59.     Weller subsequently experienced health problems and was not able to renew his flood insurance.

60.     Almost a year later, HSBC sent Weller a letter dated November 30, 2011 ("November 2011 Letter") indicating: "Recently, HSBC MORTGAGE SERVICES received a notice of cancellation or non-renewal for the insurance policy that covers your property." *See* Ex. 6. The November 2011 Letter further noted a cancellation date of December 11, 2010 for the Lloyds Policy and indicated that "[t]o prevent the placement of lender placed insurance, your response within 21 days of the date of this letter is required." *Id.*

61.     Shortly thereafter, Weller received another letter from HSBC dated December 3, 2011 ("December 2011 Letter"), only three days after the previous letter. *See* Ex. 7.  The December 2011 Letter further indicated: "Our records indicate that your property is is in a Special

Flood Hazard Area as designated by the Federal Emergency Management Agency (FEMA).  As of this date, we have not received a new or renewal flood policy covering your property." *Id.*

62.     The December 2011 Letter further represented:  "Because this coverage will provide flood coverage without detailed underwriting or elevation information, the cost may be much higher than the amount you would pay through the Federal Flood Insurance Program, and the coverage amount may be less." *Id.*  This was a blatantly false statement, as the reason force-placed insurance coverage costs more is because the amounts charged to borrowers included kickbacks to HSBC.

63.     Weller subsequently received a letter from HSBC dated January 2, 2012 ("January 2012 Letter") again indicating that HSBC had not received evidence of a flood policy covering the Weller Property. *See* Ex. 8.  The January 2012 Letter further indicated that, if proof of coverage was not provided within 30 days, HSBC would obtain one year's coverage on the Weller Property with a coverage amount of $200,000 with an annual premium of $1,800. *Id.*

64.     Like the December 2011 Letter, the January 2012 letter falsely represented that "[b]ecause this coverage will provide flood coverage without detailed underwriting or elevation information, the cost may be much higher than the amount you would pay through the Federal Flood Insurance Program, and the coverage amount may be less." *Id.*

65.     HSBC also provided Weller with a force placed insurance policy dated January 2, 2012, issued by ASIC that ostensibly provided coverage for a time period that has already passed by nearly a year, from December 11, 2010 to February 9, 2011. *See* Ex 9.  This policy covered $200,000 for buildings and structures and had an annual premium of $1,800.

66.     Weller contacted FEMA to determine whether his property was indeed in a flood zone. FEMA determined that the Weller Property was not in a flood hazard zone requiring flood insurance.

67.     On or around January 23, 2012, Weller sent HSBC documentation via certified mail demonstrating that the Weller Property was not in a flood hazard zone requiring flood insurance. Weller also provided additional documentation to HSBC demonstrating that the Weller Property was not in a flood hazard zone requiring flood insurance via fax on or around January 25, 2102.

68.     However, HSBC sent Weller another letter dated February 10, 2012 ("February 2012 Letter") indicating that HSBC had not received evidence of continuing or replacement flood insurance and that HSBC would now be providing Weller with an annual policy. *See* Ex. 10. Pursuant to the February 2012 Letter, HSBC provided Weller with a force-placed flood policy issued by ASIC covering the period December 11, 2010 to December 11, 2011, with an annual premium of $1,800 and $200,000 of coverage for buildings and structures only. *See* Ex. 11. The February 2012 Letter further indicated that the annual premium had been automatically deducted from Weller's escrow account.

69.     HSBC then sent Weller another letter dated February 17, 2012, indicating that HSBC renewed the flood policy it had provided him only days before. *See* Ex. 12. This renewed policy was also issued by ASIC and covered the period December 11, 2011 to December 11, 2012. *See* Ex. 13. The premium was also again charged to Weller's escrow account.

70.     On or around March 26, 2012, Weller again contacted HSBC to contest the force-placed flood insurance, reiterating that it was previously determined that the Weller Property was not in a flood zone requiring flood insurance.

71.     By way of letter dated April 3, 2012, HSBC again acknowledged that the Weller Property was not located in a flood hazard zone ("April 2012 Letter"). *See* Ex. 14. However, the April 2012 Letter only indicated that HSBC had waived the requirement for flood insurance effective December 7, 2011. *Id.* Weller again protested the force-placement of any flood insurance, as HSBC had previously represented in 2006 that flood insurance was not required. However, HSBC refused to remove all charges for the force-placed flood insurance.

72.     Upon information and belief, HSBC and its affiliates received a kickback from Assurant on the excessive force-placed flood insurance that was charged to Weller.

Wooden Plaintiffs

73.     Unlike the Weller Property, the Wooden Property was located in a flood hazard zone.

74.     Prior to having flood insurance force-placed by HSBC, the Woodens had purchased a flood insurance policy from Allstate ("Allstate Policy"). From approximately October 6, 2010 to October 6, 2011, the annual premium from the Allstate Policy was $738 and provided up to $162,500 of coverage for the building and $30,500 of coverage for its contents. *See* Ex. 15.

75.     The Woodens subsequently received a letter dated November 19, 2011, in which HSBC indicated that it had not received evidence of a flood policy covering the Wooden Property and that it may be necessary for HSBC to obtain a flood insurance policy for the Woodens ("November 2011 Letter"). *See* Ex. 16. With the November 2011 Letter, HSBC also enclosed the declaration page of a 60 day flood insurance policy issued by ASIC covering the

period from October 6, 2011 to December 5, 2011, and providing $162,500 of coverage for buildings and structures only with an annual premium of $2,275.  *See* Ex. 17.

76.    The November 2011 Letter further falsely represented: "Because this coverage will provide flood coverage without detailed underwriting or elevation information, the cost may be much higher than the amount you would pay through the Federal Flood Insurance Program, and the coverage amount may be less."  *See* Ex. 16.  Indeed, the reason the force-placed policy was more expensive was because the amount charged to the Woodens included substantial kickbacks to HSBC.

77.    Upon information and belief, HSBC subsequently purchased a full year force placed flood insurance policy from ASIC for $2,275 covering the period from October 6, 2011 to October 6, 2011, with an annual premiums of $2,275 which HSBC subsequently charged to the Woodens.

78.    Upon information and belief, HSBC subsequently renewed the force-placed flood insurance policy and again charged the Woodens the force-placed flood policy.

79.    Upon information and belief, HSBC and its affiliates received a kickback from Assurant on the excessive force-placed flood insurance that was charged to the Woodens.

**Government Response to Force-Placed Insurance Complaints**

80.    As referenced above, force-placed insurance practices of mortgage lenders and servicers, insurance providers and insurance producers are currently the subject of a number of government investigations.

81.    Thus, state attorneys general have taken action concerning servicers' abusive practices concerning force-placed insurance.  Recently, a coalition of forty-nine (49) state attorneys general entered into an historic joint state-federal settlement agreement with the country's five largest loan servicers ("National Mortgage Settlement") to address numerous

problems that have surfaced during the foreclosure crisis. *See* www.nationalmortgagesettlement.com/ (last accessed Jan. 25, 2013), the official website established by the government relating to the settlement. *See also* Jeff Horwitz, *Attorneys General Draw a Bead on Banks' Force-Placed Insurance Policies, American Banker* (Mar. 10, 2011, 12:25 PM).

82.     Among other terms, the proposed settlement would essentially prohibit servicers from profiting from force-placed insurance.     Specifically, under the proposed settlement, mortgage servicers: (a) shall not obtain force-placed insurance unless there is a reasonable basis to believe the borrower has not paid for property insurance; (b) cannot force-place insurance that is in excess of the replacement cost of the improvements on the secured property; (c) must work with the borrower to continue or reestablish the existing homeowner's policy; (d) shall continue to make payments if there is a lapse in payment and the payments are escrowed regardless of homeowner payment; and (e) must purchase the force-placed insurance for a commercially reasonable price. *Id.*; *see also* Consent Judgment, *United States of America v. Bank of America Corp.*, Civ. No. 1:12-cv-00361-RMC (D.D.C. Apr. 14, 2012) (ECF No. 14 Section VII).

83.     Recently, the force-placed insurance practices of lenders, servicers and insurance companies have come under increased scrutiny by regulatory authorities.     In October 2011, a number of mortgage servicers and insurers, including HSBC Insurance (USA) Inc., received subpoenas from the New York Department of Financial Services ("NYDFS") with respect to lender-placed insurance activities dating back to September 2005.     HSBC has provided and continues to provide documentation and information to the NYDFS in connection with this subpoena. *See* HSBC Finance Corp. 10-Q for the quarter ending June 30, 2012, filed on July 27, 2012, at 61-62.

84.     A recent state examination of HSBC's mortgage servicing practices also concluded that borrowers were overcharged for lender-placed hazard insurance coverage based on the terms of the underlying mortgages during the period of August 2009 through September 2011, and required HSBC to refund excess premiums charged to impacted borrowers in that state. *Id.* In the first quarter of 2012, HSBC recorded an accrual reflecting its estimate of premiums that will be refunded to the impacted borrowers as well as borrowers in other states that HSBC recognizes may have similar contractual claims. *Id.*

85.     The NYDFS also convened hearings on May 17, 18 and 21, 2012, to investigate the force-placed insurance industry.   On the opening day of these hearings, NYDFS Superintendent Benjamin Lawsky noted that his department's initial inquiry uncovered "serious concerns and red flags" which included:  (a) exponentially higher premiums for force-placed insurance than regular homeowners insurance; (b) extraordinarily low loss ratios; (c) harm to distressed borrowers; (d) lack of competition in the market; (e) increased reliance on force-placed insurance as a major profit center for both banks and insurers; and (f) "tight relationships between banks, their subsidiaries and insurers." *See* Opening Statement of Benjamin M. Lawsky, Superintendent of Financial Services (May 17, 2012).   As Superintendent Lawsky summarized, the net result of these practices:

> Take the form of large commissions being paid by insurers to the banks for what appears to be very little.  In other cases, banks have set up reinsurance subsidiaries who take over the risk from the insurance companies.  Thus, the banks pay high premiums for coverage that is highly profitable and then those profits revert right back to the banks through reinsurance agreements.
>
>     *     *     *     *
>
> In sum, when you combine [the] close and intricate web of relationships between banks and insurance companies on the one hand, with high premiums, low loss ratios and lack of competition on the other hand, it raises serious issues and questions....

*Id.*

86.     The force-placed insurance practices of the Assurant Defendants, and their lender partners, were front and center at the NYDFS hearings. *See,* e.g., Frobose NYDFS Testimony; Birnbaum NYDFS Testimony; and Hunter NYDFS Testimony; *see also* Assurant, Inc. Form 10-K for the year ending December 31, 2011, filed on February 23, 2012, at F-83 (noting that "on February 7, 2012, the company and two of its insurance subsidiaries (ASIC and American Bankers Insurance Company of Florida) received subpoenas from the New York Department of Financial Services (the NYDFS) regarding its lender-placed insurance business and related document retention practices.").

87.     In addition, the National Association of Insurance Commissioners ("NAIC") – the lead national insurance regulatory organization created and governed by the chief insurance regulators from all 50 states that is charged with establishing standards and best practices, conducts peer review, and coordinates regulatory oversight – recently began investigating force-placed insurance practices and held public hearings on August 9, 2012 to look into the force-placed insurance practices of banks and their partners. *See* Mark E. Ruquet, *NAIC Promises Greater Focus on Force-Placed Insurance as CFPB Proposes Rules*, PropertyCasualty360.Com (Aug. 10, 2012), available at http://www.propertycasualty360.com/2012/08/10/naic-promises-greater-focus-on-force-placed-insura (last accessed Jan. 25, 2013). The practices of the Assurant Defendants again featured prominently on the NAIC's agenda.

88.     Notably, state insurance commissioners and federal regulators have investigated and condemned captive reinsurance arrangements in the title insurance industry – which also had a relatively low level of losses – as nothing more than sham transactions designed to funnel unlawful kickbacks for business referrals. *See, e.g.* Broderick Perkins, Title Insurance Industry

in Hot Water with Regulators Again, San Jose Business Journal (May 22, 2005), available at http://www.bizjournals.com/sanjose/stories/2005/05/23/story4.html?page=all (last accessed Jan. 25, 2013).

89.     Indeed, while announcing a $37.8 million settlement with nine title insurers, California Insurance Commissioner John Garamendi stated that "[t]his reinsurance scheme appears to be nothing more than a form of commercial bribery." *See* Dale Kasler, *3 Title Insurers to Pay Refunds: Companies Settle State Case Accusing Them of Paying Kickbacks In Return For Referrals*, Sacramento Bee (July 21, 2005). As a result, a number of providers have abandoned such arrangements altogether.

90.     Fannie Mae has also changed its policies to curb bank and servicers' improper practices. On March 14, 2012, Fannie Mae issued a Service Guide Announcement "amending and clarifying its policies regarding the use, coverage, requirements, deductibles, carrier eligibility requirements and allowable expenses for lender-placed insurance" for servicers of the loans it holds. *See* Fannie Mae Servicing Guide Announcement SVC-2012-04. The Fannie Mae guidelines seek to eliminate the abuses prevalent in the force-placed insurance industry (such as those engaged in by Defendants) including requiring that the cost of force-placed insurance be "competitively priced" and "commercially reasonable" and must exclude:

- any lender-placed insurance commission earned on that policy by the servicer or any related entity;

- costs associated with insurance tracking or administration, or;

- any other costs beyond the actual cost of the lender-placed insurance policy premium.

*Id.* at 4.

91.     The New York State Department of Financial Services' recent hearings on force-placed insurance practices have further resulted in government action and findings that

borrowers were overcharged for force-placed insurance. On June 12, 2012, Governor Cuomo's official website announced, "DFS Investigation Indicates Insurance Companies Overcharged for Force-Placed Insurance." Available at http://www.governor.ny.gov/press/06122012DFS (last accessed Jan. 25, 2013). It stated:

> The evidence of higher than necessary insurance premiums was made clear at a recent DFS hearing. Also, the DFS discovered that the force-placed insurance market lacks the sort of competition that would keep premiums down. In New York, two companies have 90% of the market. In addition, the hearings made clear that force placed insurance costs are having a terrible impact on homeowners, while banks and insurers are profiting off the payments.

*Id.*

92.     The relatively low level of losses associated with force-placed insurance indicates that reinsurance with captives is likely unnecessary. For example, during 2009, the Assurant Defendants collected approximately $2.7 billion of premiums through its Specialty Insurance Division, which is overwhelmingly devoted to force-placed insurance. Notably, this insurer paid out only 35% of this amount in claims – though in the company's other lines of business, a 70% claims-to-premiums ratio is the norm. Not surprisingly, far from being an excessive risk, force-placed insurance is actually this insurer's most profitable product. Birnbaum NYDFS Testimony at 11. Birny Birnbuam, in his testimony before the NYDFS presented statistics collected by the NAIC reflecting nationwide loss ratios for LPI hazard insurance during the 2004-2011 period as being, on average, more than thirty-five points higher than the ratios for commercially available homeowners policies. *Id.* at 9. When confined to the period from 2007-2011, the disparity between LPI hazard insurance loss ratios and those of commercially available homeowners polices was nearly 42 points. *Id.*

93.     As *American Banker* observed, "[w]hile servicers that partner with force-placed insurers customarily perform little of the work in monitoring their portfolios for lapses and writing policies, payments to them are simply a cost of doing force-placed business." *See* Ties to Insurers.    These costs are ultimately paid by the borrowers and serve to unjustly enrich all Defendants, including those with whom the borrower has no contractual relationship such as the Assurant Defendants.

94.     Notably, Assurant Inc.'s public filings indicate that approximately 40% of its force-placed insurance division's revenue is allocated to pay for "general expenses."    This category includes commissions/referral fees paid to lenders.    In other lines of insurance, overhead and expenses are usually a much smaller fraction of policyholder claims. *See* Assurant, Inc. Form 10-K for the year ending December 31, 2011, filed on February 23, 2012, at 61. Indeed, industry analysts have opined that referral fees, commissions and other payments to bank affiliates explain why insurers' overhead, which is ultimately pass onto borrowers, is higher – implying paydays for servicers amounting to hundreds of millions of dollars per year. *See, e.g.,* Birnbaum NYDFS Testimony.

95.     Moreover, the amounts HSBC chose to impose upon borrowers for FPI are unlawful because they include tracking servicing costs and expenses on top of the cost of the force-placed insurance itself, including loan tracking and servicing activities, which result in kickbacks to HSBC in the form of services in kind.

96.     HSBC's practices of referring force-placed insurance business to affiliates or otherwise profiting from the force-placement of insurance policies tend to keep premiums for force-placed insurance artificially inflated over time because a percentage of borrowers' premiums are not actually being paid to cover actual risk, but are simply funding illegal

28

kickbacks. Amounts paid to servicers as commissions have become a part of the cost of doing business for force-placed insurance providers. As a result, force-placed insurance premiums incorporate the payment of such kickbacks – to the detriment of consumers.

97.     Further, HSBC's conduct has threatened and, indeed, stifled competition. As the NAIC recently opined when asked whether pricing in the area of force-placed insurance industry is competitive, servicers have "no incentive to select a competitively priced product, but instead would be more concerned with selecting one they know best protects the bank's interests or one where they are provided with an incentive or inducement to enter into the transaction." *See* Ties to Insurers. This suppression of competition and subsequent harm to borrowers is a direct result of the scheme alleged herein.

## RICO ALLEGATIONS

98.     Plaintiffs, Members of the Classes and Defendants are "persons" within the meaning of 18 U.S.C. § 1961(3).

99.     Based on Plaintiffs' current knowledge, the following persons constitute a group of individual persons associated who constitute a RICO enterprise that is referred to herein as the "HSBC Force-Placed Insurance Enterprise": HSBC, the Assurant Defendants, and other insurance producers and entities involved in force-placing insurance on behalf of HSBC not named as defendants herein who assist the named defendants in effectuating their scheme to defraud Plaintiffs and other borrowers who were required to pay for force-placed flood insurance.

100.     The HSBC Force-Placed Insurance Enterprise is an ongoing organization that engages in, and whose activities effect, interstate commerce.

101. While each of the Defendants participated in and are members of the HSBC Force-Placed Insurance Enterprise, they also have an existence separate and distinct from the enterprise. The structure of the enterprise is reflected in the allegations herein. In particular, HSBC implemented a plan to exploit its authority as a loan servicer acting on behalf of the mortgagors who owned Plaintiffs' and the Members of the Classes' mortgages to force-place flood insurance to protect its interest in Plaintiffs' and Members of the Classes' mortgaged properties, to purchase high-priced insurance from its exclusive provider Assurant, Inc. and/or its subsidiaries and affiliates, enriching themselves through the provisions of high-priced force-placed insurance at Plaintiffs' and Members of the Classes' expense, and in the process used its own affiliates to funnel improper kickbacks in the form of fees, commissions, "rebates," service in kind, and other consideration to it, and thereby generate a profit for itself and the other enterprise participants at Plaintiffs and other borrowers' expense causing injury to Plaintiffs' and borrowers' business or property.

**Conduct of the RICO Enterprise**

102. As members of the HSBC Force-Placed Insurance Enterprise, Defendants engaged in the following conduct in furtherance of the aims and objectives of the enterprise:

(a) HSBC exercised (and abused) its authority to force-place Plaintiffs' and other borrowers' flood insurance granted it under the terms of the mortgage contracts for lenders for whom they serviced mortgage loans. Rather than renewing Plaintiffs' and other borrowers' existing policies or obtaining the insurance at a commercially reasonable price, HSBC force-placed the insurance with its exclusive providers, thus choosing a more expensive policy to enrich itself at Plaintiffs' and Members of the Classes' expense.

(b) HSBC and its affiliates and subsidiaries including the Assurant Defendants in coordination with HSBC, provided and administered excessively priced policies

charging Plaintiffs and other borrowers not only for the cost of their force-placed insurance, but also charging them for the costs of kickbacks, fees, commissions and other consideration in the form of force-placed insurance premiums which were either charged directly to Plaintiffs and other borrowers, added to Plaintiffs' existing mortgage loan balances or charged to their escrow accounts.

(c)     HSBC entered into exclusive deals with the Assurant Defendants to force-place flood insurance on terms incorporating or requiring ancillary services and arrangements designed to generate additional profits which were steered to fellow scheme members.

(d)     HSBC paid fees, commissions, rebates, "earnouts" and other consideration to the Assurant Defendants, purportedly for their role as "insurance producers" when they did not, in fact, produce any insurance business for HSBC or provide legitimate insurance agency services  as at all times relevant to this complaint, HSBC had entered into exclusive agreements with the Assurant Defendants.  In effect, HSBC used these arrangements to establish conduits to funnel a portion of Plaintiffs' and Members of the Classes' premiums back to it.

(e)     Defendants colluded to include in the premiums paid by the small number of borrowers whose insurance was force-placed the costs of servicing HSBC's entire portfolio of loans (i.e. for portfolio monitoring, tracking and related administrative functions) in addition to the costs directly attributable to force-placing the insurance.  This practice operated as a subsidy to HSBC, the loan servicer.  The structure created between HSBC, the Assurant Defendants, and their affiliates operated to funnel the profits thus derived directly to HSBC.  *See, e.g.* Testimony of Birny Birnbaum of Behalf of the Center for Economic Justice for the Florida Office of Insurance Regulation (July 3, 2012).

(f)   Upon information and belief, HSBC's tracking and outsourcing was performed by the Assurant Defendants for little or no charge.

**Defendants' Misrepresentations and Omissions**

103.   As set forth herein, HSBC and the Assurant Defendants made numerous material misrepresentations, omissions and half-truths to borrowers and others in furtherance of their fraudulent scheme.   These misrepresentations, omissions and half-truths created a false impression that Defendants were operating within the bounds of their contractual authority.   The intricate and secretive operations of the force-placed insurance scheme, which are of the type that ordinary consumers and borrowers would not be able to be aware of, necessitate Defendants to have made full disclosure of all the relevant facts necessary to avoid misrepresentations, omissions and half-truths.   Instead, Defendants kept the true nature of their activities concealed and borrowers were harmed as a result.

104.   In order for Defendants' fraudulent force-placed insurance scheme to be successful, Defendants intentionally maintained the appearance of traditional provision of insurance disguising the improper provision of high cost, duplicative and unnecessary force-placed insurance as an unremarkable and legitimate transaction when it was not.   In order to maintain the illusion of legitimacy, Defendants deceived Plaintiffs and Members of the Classes by failing to disclose the true nature of their self-dealing, profit making venture.

**Predicate Acts of Mail and Wire Fraud: 18 U.S.C. §§ 1341 and 1343**

105.   Section 1961(1) of RICO provides that "racketeering activity" includes any act indictable under 18 U.S.C. § 1341 (relating to mail fraud) and 18 U.S.C. § 1343 (relating to wire fraud).   As set forth below, Defendants have engaged in conduct violating each of these laws to effectuate their scheme.

106.    For the purpose of executing and/or attempting to execute the above described scheme to obtain money by means of false or fraudulent pretenses, representations or promises, each of the Defendants, in violation of 18 U.S.C. § 1341, on two or more occasions, throughout the Class period and up to and including the present, either caused matter and things to be delivered by the Postal Service or by private commercial interstate carriers or knew and agreed that matter and things would be delivered by the Postal Service or by private or commercial interstate carriers, including, as described in greater detail below, loan documents, correspondence relating to the provision of force-placed flood insurance, such as applications, agreements, checks or money orders, notices, correspondence to Plaintiffs and Members of the Classes and correspondence and memoranda to and among each other.

107.    For the purpose of executing and/or attempting to execute the above described scheme to obtain money by means of false or fraudulent pretenses, representations or promises, each of the Defendants, in violation of 18 U.S.C. § 1343, on two or more occasions, through the Class period and up to and including the present, transmitted and received by wire, matter and things, including transfers of money, correspondence, reports, memoranda, manuals, applications and agreements and were transmitted over the telephone or through facsimile, electronic mail and internet.

108.    Each of the Defendants sent matter and things via the postal service, private or commercial carrier, wire or other interstate media, inter alia, as described in the foregoing incorporated paragraphs and set forth with specificity below, in furtherance of their scheme to force-place high-cost, unnecessary and duplicative force-placed insurance.

109.    These notices, telephone calls, correspondence and other communications allowed Defendants to execute their plan and were used to perpetuate the misrepresentations and

omissions that lay at the core of Defendants' scheme. While providing an outward appearance of legitimacy, they misrepresented the nature and extent of HSBC's authority to force-place insurance and misrepresented that Defendants were force-placing insurance to protect the lender's interest in the secured property and omitted to inform Plaintiffs and the Class that Defendants were engaging in a self-dealing, profit making enterprise at their expense, and included:

      (a)     Notices sent by HSBC, the Assurant Defendants, or their subsidiaries, with HSBC's knowledge and consent, to Plaintiffs and Members of the Classes informing them of their authority to force-place flood insurance. A series of these notices, often referred to as cycle letters, was sent to Plaintiffs and each Class member, amounting to hundreds of thousands of mailings in furtherance of the Defendants' scheme.

      (b)     HSBC, the Assurant Defendants, either in their own capacity or through their subsidiaries and/or affiliates, communicated with borrowers who their systems identified as having lapsed insurance, on multiple occasions by written and verbal (telephone) communications. *See e.g,* Exhibits 6, 7, 8, 10, 12, 14, 16; *see also* Frobose NYDFS Testimony. These mailings contained false information, half-truths and/or omitted information necessary for borrowers to understand the nature of the force-placed insurance scheme they were being subjected to by Defendants. For example, among other misrepresentations, communications delivered by HSBC represented that the cost of force-placed flood insurance may be much higher than the amount paid through the Federal Flood Insurance Program because of a lack of individual underwriting when, in reality, the cost of force-placed flood insurance was higher because it included kickbacks to Defendants. *See e.g.* Ex 9, 16.

(c)    The Assurant Defendants used the wires to monitor and track HSBC's loan servicing portfolio and to identify borrowers whose insurance had lapsed. This monitoring and tracking function was done pursuant to the scheme and specifically in an effort to find additional scheme victims.

(d)    HSBC and the Assurant Defendants mailed policies and declarations to Plaintiffs and Members of the Classes. These policies and declarations were known to contain half-truths, misinformation and omit critical information needed by borrowers to protect themselves from the scheme.

(e)    HSBC communicated to Plaintiffs and Members of the Classes through the mail, email, and on the internet. These communications were in furtherance of the force-placed insurance scheme.

(f)    HSBC maintains a website through which Plaintiffs and Members of the Classes could pay for the fraudulently placed force-placed insurance premiums and obtain information regarding their escrow accounts. *See* https://www.hsbcmortgageservices.com/home (last accessed on Jan. 25, 2013).

(g)    HSBC's website did not contain information necessary for borrowers to understand the true nature and purpose of the force-placed insurance scheme.

(h)    HSBC and the Assurant Defendants used the wires to establish and manage Plaintiffs' and Members of the Classes' escrow accounts, including funding and transferring money which should not have been funded or transferred, from the escrow accounts to themselves.

(i)     Defendants accepted the improperly-gained payment of money from Plaintiffs and Members of the Classes through the mail and by computer transfer/payment of funds.

**Pattern of Racketeering Activity**

110.    Defendants have engaged in a "pattern of racketeering activity," as defined by 18 U.S.C. § 1961(5), by committing at least two acts of racketeering, *i.e.*, indictable violations of 18 U.S.C. §§ 1341 and 1343 as described herein, during the class period.  Indeed, Defendants have committed thousands of such acts in connection with the hundreds of thousands of loans for which they force-placed insurance.

111.    The multiple acts of racketeering activity that Defendants committed and/or conspired to commit were related to each other, and amount to and pose a threat of continued racketeering activity, and therefore constitute a "pattern of racketeering activity" as defined in 18 U.S.C. § 1961(5).

**Defendants' Conduct Caused Direct Injury**

112.    Plaintiffs and Members of the Classes suffered direct and proximate harm as a result of Defendants' misrepresentations, omissions, deceptions and acts of concealment and caused injury to their property and/or business in the following ways:

(a)     Defendants force-placed Plaintiffs and Members of the Classes into high cost policies which resulted in unjust profit to Defendants rather than renewing Plaintiffs' and Members of the Classes' existing policies or purchasing policies at a commercially reasonable price;[6]

---

[6]     As noted above, Fannie Mae's new servicing guidelines require loan servicers and their force-placed insurance providers to do just this.

(b)     Charging the premiums for high cost and unnecessary force-placed insurance to Plaintiffs' and Members of the Classes' escrow accounts;

(c)     Adding amounts equaling unpaid force-placed insurance premiums to the balance of Plaintiffs' and Members of the Classes' loans adding to their debt and reducing their equity in their homes;

(d)     Imposing additional costs and debt obligations;[7]

(e)     Unlawfully backdating force-placed insurance policies for periods of time where there was no loss; and

(f)     Charging for excessive force-placed flood insurance.

**Conspiracy Allegations**

113.    In violation of 18 U.S.C. 1962(d), Defendants have, as set forth above, conspired to violate 18 U.S.C. 1962(c).  The object of the conspiracy was to generate secret profits for Defendants through the Defendants' improper and unlawful abuse of HSBC's authority to force-place flood insurance for borrowers whose flood insurance had lapsed.  Instead of providing reasonably priced insurance, Defendants provided unnecessarily high priced policies for unnecessary, duplicative and back dated force-placed insurance.  Defendants acted together and misrepresented the reasons for the high cost of the insurance and omitted to inform Plaintiffs and the Classes that they were making a substantial profit from the provision of force-placed insurance in a manner inconsistent with their duties and authority granted them under Plaintiffs' and Members of the Classes' mortgage contracts.

---

[7]     Fannie Mae's new guidelines prohibit the payment of commissions and similar forms of consideration.

114.     As set forth above, each of the Defendants knowingly, willfully and unlawfully agreed and combined to conduct or participate, directly or indirectly, in the conduct of the affairs and activities of the HSBC Force-Placed Insurance Enterprise through a pattern of racketeering activity, including indictable acts under 18 U.S.C. §§ 1341 and 1343 in violation of 18 U.S.C. § 1962(c).

115.     The agreement between and among the Defendants to act in concert to defraud Plaintiffs and the Classes is evident from the conduct in which each engaged that supported and was used by each to implement the improper, deceptive and misleading fraudulent scheme.

116.     Each of the Defendants engaged in multiple overt acts in furtherance of the conspiracy to defraud borrowers who were required by HSBC to pay for force-placed insurance, including misrepresenting the true reasons for the high cost of force-placed insurance and failing to inform borrowers that they were profiting from the transaction at their expense.

(a)     HSBC, through its exclusive providers of force-placed insurance and their affiliates and subsidiaries, developed and forwarded misleading notices to Plaintiffs and the Class which did not disclose that it was earning money from the transaction.

(b)     By entering into exclusive deals whereby the force-placed insurance providers, the Assurant Defendants and their affiliates and subsidiaries not only charged for the cost of providing force-placed insurance, but also enabled HSBC to improperly recoup general servicing costs by charging the small subset of borrowers' whose insurance was force-placed for the costs of servicing HSBC's loan portfolio, including such portfolio-wide administrative activities as tracking and monitoring, the costs of which were not properly included in Plaintiffs' and other borrowers' force-placed insurance premiums. *See* Birnbaum NYDFS Testimony.

38

(c)     Paying fees, commissions or other consideration to subsidiaries and affiliates for *producing* insurance business for HSBC when they do not perform the traditional role of an insurance broker and do not and did not, in fact, *produce* any insurance in the traditional sense as HSBC entered into exclusive deals with the Assurant Defendants under which it provided all force-placed insurance for HSBC.  Indeed, the Assurant Defendants did not perform any of the traditional duties of insurance producer, such as evaluating the individual needs of the policy holder or seeking the most competitive price for the borrower.  *Id.*

### CLASS ACTION ALLEGATIONS

117.    Plaintiffs bring this action pursuant to Federal Rules of Civil Procedure 23(a) and 23(b)(1), (b)(2) and/or (b)(3) on behalf of the following Classes:

> All persons who, within the applicable statute of limitations, have or had a residential mortgage loan or line of credit owned, originated and/or serviced by HSBC Mortgage Services Inc. and, in connection therewith, were required to pay for "force-placed" flood insurance on the secured property, including but not limited to those FPI policies procured by HSBC through the Assurant Defendants and/or their affiliates or subsidiaries (the "National Class").

In the alternative, and to the extent deemed necessary by the Court, Plaintiffs also seek to certify a number of state subclasses (collectively "State Subclasses"), as follows:

> All persons or entities in the State of Colorado who, within the applicable statute of limitations preceding the filing of this action, have or had a residential mortgage loan or line of credit owned, originated and/or serviced by HSBC Mortgage Services Inc. and, in connection therewith, were required to pay for "force-placed" flood insurance on the secured property, including but not limited to those FPI policies procured by HSBC through the Assurant Defendants and/or their affiliates or subsidiaries (the "Colorado Subclass").

> All persons or entities in the State of Virginia who, within the applicable statute of limitations preceding the filing of this action, have or had a residential mortgage loan or line of credit owned, originated and/or serviced by HSBC Mortgage Services Inc. and,

in connection therewith, were required to pay for "force-placed" flood insurance on the secured property, including but not limited to those FPI policies procured by HSBC through the Assurant Defendants and/or their affiliates or subsidiaries (the "Virginia Subclass").

118.   The National Class and the State Subclasses are collectively referred to as the "Classes."

119.   The Classes exclude Defendants and any entity in which Defendants have a controlling interest, and their officers, directors, legal representatives, successors and assigns.

120.   The membership in each of the proposed Classes is so numerous that joinder of all members is impracticable.

121.   A Class action is superior to all other available methods for the fair and efficient adjudication of this controversy.

122.   Plaintiffs' claims are typical of the claims of the Classes.

123.   There are questions of law and fact common to the Classes, which will generate common answers central to the resolution of the case.  These include but are not limited to:

(a)    The nature, scope and implementation of Defendants' unlawful, improper and fraudulent acts;

(b)    Whether Defendants conspired in furtherance of the unlawful acts alleged herein;

(c)    Whether Defendants have engaged in mail and wire fraud;

(d)    Whether Defendants have engaged in a pattern of racketeering activity;

(e)    Whether the HSBC Force-Placed Insurance Enterprise is an enterprise within the meaning of 18 U.S.C. § 1961(4);

(f)     Whether Defendants conducted or participated in the affairs of the HSBC Force-Placed Insurance Enterprise through a pattern of racketeering activity in violation of 18 U.S.C. § 1962(c);

(g)     Whether Defendants' overt and/or predicate acts in furtherance of the conspiracy and/or direct acts in violation of 18 U.S.C. § 1962(c) proximately caused injury to Plaintiffs' and members of the Classes' business or property;

(h)     Whether Defendants misrepresented the reason for the high cost of force-placed insurance;

(i)     Whether Defendants misrepresented that the Plaintiffs' and members of the Classes' mortgage contracts authorized them to force-place insurance in the manner they did;

(j)     Whether Defendants fraudulently concealed their scheme;

(k)     Whether Defendants maintained a policy of referring force-placed insurance business to insurers pursuant to pre-arranged agreements;

(l)     Whether HSBC maintained a policy of referring force-placed insurance business to affiliates;

(m)     Whether HSBC breached the terms of Plaintiffs' and members of the Classes' mortgages or loan contracts;

(n)     Whether HSBC breached its fiduciary duty to Plaintiffs and members of the Classes;

(o)     Whether the Assurant Defendants induced and/or participated in HSBC's breach of fiduciary duty.

(p)     Whether Defendant HSBC received commission payments from force-placed insurance providers;

41

(q)     Whether Defendant HSBC received unauthorized and illicit payments in connection with force-placed insurance that were unrelated to any *bona fide* service in connection with the force-placed insurance and its purpose;

(r)     Whether Defendants wrongfully backdated forced-placed insurance policies;

(s)     Whether Defendants violated their implied covenant of good faith and fair dealing;

(t)     Whether HSBC intentionally or negligently made material misrepresentations and omissions to Plaintiff and the Classes regarding its procurement of FPI policies from the Assurant Defendants and/or their affiliates or subsidiaries;

(u)     Whether Defendants' conduct constituted an unfair, unlawful or fraudulent business practice in violation of the various states' deceptive and unfair trade practice laws;

(v)     Whether Defendants received financial benefits from the force-placed insurance provider in the form of insurance monitoring, tracking and processing services;

(w)     Whether the provision in HSBC's standard residential mortgage agreements authorizing HSBC to charge borrowers for the "cost" of obtaining FPI is procedurally and substantively unconscionable because it does not authorize nor contemplate that HSBC and/or its related entities would derive a hidden financial benefit by procuring FPI from the Assurant Defendants and/or their affiliates and subsidiaries, and where a portion of the amounts charged to residential borrowers' accounts are returned, transferred or paid to HSBC and/or related entities;

(x)     Whether the Assurant Defendants has been unjustly enriched by charging residential borrowers amounts for FPI procured from the Assurant Defendants and/or their

affiliates and subsidiaries; a portion of which were returned, transferred or paid to HSBC or to its related entities;

(y)      Whether Defendants or their affiliates participated in arrangements that involved kickbacks; and

(z)      Whether Defendants are liable to Plaintiffs and the Classes for damages and, if so, the measure of such damages.

124.    These and other questions of law and/or fact are common to the Classes and predominate over any questions affecting only individual Members of the Classes.

125.    These and other questions of law and/or fact are common to the Classes and predominate over any questions affecting only individual Members of the Classes.

126.    Plaintiffs will fairly and adequately represent and protect the interests of the members of the Classes. Plaintiffs have no claims antagonistic to those of the Class. Plaintiffs have retained counsel competent and experienced in complex nationwide class actions, including all aspects of litigation. Plaintiffs' counsel will fairly, adequately and vigorously protect the interests of the Classes.

127.    Class action status is warranted under Rule 23(b)(1)(A) because the prosecution of separate actions by or against individual members of the Classes would create a risk of inconsistent or varying adjudications with respect to individual members of the Classes, which would establish incompatible standards of conduct for Defendants.

128.    Class action status is also warranted under Rule 23(b)(1)(B) because the prosecution of separate actions by or against individual members of the Classes would create a risk of adjudications with respect to individual members of the Classes which would, as a

practical matter, be dispositive of the interests of the other members not parties to the adjudications or substantially impair or impede their ability to protect their interests.

129.    Class action status is also warranted under Rule 23(b)(2) because Defendants have acted or refused to act on grounds generally applicable to the Class, thereby making appropriate final injunctive relief or corresponding declaratory relief with respect to the Class as a whole.

130.    Class action status is also warranted under Rule 23(b)(3) because questions of law or fact common to the members of the Classes predominate over any questions affecting only individual members, and a class action is superior to other available methods for the fair and efficient adjudication of this controversy.

## CLAIMS FOR RELIEF

### COUNT ONE

**(ON BEHALF OF THE NATIONAL CLASS AND THE STATE SUBCLASSES AGAINST THE HSBC DEFENDANTS)**

**BREACH OF CONTRACT**
**(INCLUDING IMPLIED COVENANT OF GOOD FAITH AND FAIR DEALING)**

131.    Plaintiffs hereby incorporate by reference the preceding paragraphs as if they were fully set forth herein.

132.    HSBC has serviced loans evidenced by substantially similar standard form notes and mortgage contracts.

133.    Every contract contains an implied covenant of good faith and fair dealing.

134.    In all of their actions described herein, HSBC acted on their own behalf and as the duly authorized agent of the owner or assignee of the mortgage agreements of Plaintiffs and the

Members of the Classes.  HSBC was contractually obligated to service the loans of Plaintiffs and the Members of the Classes pursuant to the terms of their mortgage agreements.

135.    The mortgage contracts of Plaintiffs and the Members of the Classes contained an implied covenant of good faith and fair dealing, pursuant to which HSBC was bound to exercise the discretion afforded them under the mortgage contract in good faith and to deal fairly with Plaintiffs and the Members of the Classes in that regard.  HSBC is not allowed to evade the spirit of the mortgage contract by exercising discretion afforded them under the mortgage to force place insurance in a manner abusive to borrowers.

136.    Any discretionary authority granted to HSBC under the terms of Plaintiffs' and the Members of the Classes' mortgage contracts was subject to HSBC's implied duty of good faith and fair dealing.  Accordingly, to the extent that the mortgage contracts of Plaintiffs and the Members of the Classes permitted HSBC to unilaterally "force-place" insurance, HSBC was obligated not to exercise their discretion to do so in bad faith for their own financial gain for the purposes of maximizing profits at borrowers' expense.

137.    HSBC breached its duties of good faith and fair dealing in at least the following respects, among others:

(a)    Failing to make any effort whatsoever to maintain borrowers' existing insurance policies and, instead—for the sole purpose of maximizing their own profits—forcing borrowers to pay for insurance policies from providers of HSBC's choice, such as the Assurant Defendants.  These policies needlessly came with substantially greater premiums and less coverage than borrowers' existing policies, while providing an improper financial benefit to HSBC and/or its affiliates;

45

(b)     Using their discretion to choose a force-placed insurance provider and policy in bad faith and in contravention of the parties' reasonable expectations by purposefully forcing borrowers to pay for more than the cost of protecting the lender's interest in the secured property;

(c)     Failing to seek competitively priced insurance on the open market and instead selecting force-placed insurance providers according to pre-arranged secret deals whereby the insurance policies were continually purchased through the same companies;

(d)     Assessing excessive, unreasonable, and unnecessary insurance policy premiums against Plaintiffs and the Members of the Classes and misrepresenting the reason for the cost of the policies;

(e)     Backdating force-placed insurance policies to cover time periods which have already passed and for which there was already absolutely no risk of loss;

(f)     Misrepresenting in their force-placed insurance notices that borrowers were obligated to pay for backdated insurance coverage for periods during which the lender had no risk of loss due to the passing of time and/or the lender's coverage under a "standard mortgage clause" and/or a Lender's Loss Payable Endorsement;

(g)     Procuring force-placed insurance policies to cover time periods during the mortgagee is already covered pursuant to a Lender's Loss Payable Endorsement; and

(h)     Failing to provide borrowers with any opportunity whatsoever to opt out of having their force-placed insurance policies provided by an insurer with whom HSBC had a reinsurance or commission arrangement or an affiliate relationship.

138.    Further, to the extent that the mortgage contracts of Plaintiffs and the Class permitted HSBC to unilaterally "force-place" insurance, HSBC was contractually permitted to do

so only to the extent required to reasonably protect the mortgagee's interest in the secured property.

139.    Nonetheless, HSBC has imposed or collected amounts that exceeded the amounts required to protect the mortgagee's interest in the policy.  Such practices have included, without limitation: (a) requiring borrowers to pay for insurance coverage that exceeds the amount necessary to protect the mortgagee's interest in the secured property; (b) backdating force-placed insurance policies, thus requiring borrowers to pay for retroactive coverage despite the fact that the time has lapsed and no loss occurred during the lapsed period; and (c) requiring borrowers to pay for force-placed insurance policies despite the existence of a Lender's Loss Payable Endorsement or standard mortgage clause that already protects the lender's interest in the property.

140.    By force-placing insurance that goes well beyond the pale of what is required to protect their interests, HSBC has breached express contractual obligations owed to Plaintiffs and the Members of the Classes.

141.    As direct, proximate, and legal result of the aforementioned breaches of the covenant of good faith and fair dealing and the express terms of the mortgage contracts, Plaintiffs and the Members of the Classes have suffered damages and are entitled to the relief sought herein for such breaches of contract.

## COUNT TWO

### (ON BEHALF OF THE NATIONAL CLASS AND THE STATE SUBCLASSES AGAINST ASSURANT DEFENDANTS)

### UNJUST ENRICHMENT/DISGORGEMENT

142.    Plaintiffs hereby incorporate by reference the preceding paragraphs as if they were fully set forth herein.

143. Plaintiffs and the Members of the Classes have conferred a substantial benefit upon the Assurant Defendants derived from the force-placed insurance premiums paid by Plaintiffs and the Members of the Classes.

144. By, among other things, providing unnecessary and exorbitantly priced FPI policies on the properties of Plaintiffs and the members of the Classes pursuant to its exclusive contract with HSBC, and by backdating policies, the Assurant Defendants were able to collect substantial premiums for unnecessary and unusable property insurance coverage. The Assurant Defendants were unjustly enriched by these practices.

145. These payments were accepted and retained by the Assurant Defendants under circumstances such that it would be inequitable for the Assurant Defendants to retain the benefit without payment to Plaintiffs and the members of the Classes.

146. As a result of the Assurant Defendants' unjust enrichment, Plaintiffs and the Members of the Classes have sustained damages in an amount to be determined at trial and seek full disgorgement and restitution of the Assurant Defendants' enrichment, benefits, and ill-gotten gains acquired as a result of the unlawful or wrongful conduct alleged above.

147. Further, Plaintiffs and the Members of the Classes, individually and on behalf of the public, seek restitution and disgorgement of profits realized by the Assurant Defendants as a result of their unfair, unlawful and/or deceptive practices.

## COUNT THREE

### (ON BEHALF OF THE NATIONAL CLASS AND THE STATE SUBCLASSES AGAINST ALL DEFENDANTS)

### VIOLATION OF THE RACKETEER INFLUENCED AND CORRUPT ORGANIZATIONS ACT, 28 § U.S.C. 1962(C) – RICO

148. Plaintiffs hereby incorporate by reference the preceding paragraphs as if they were fully set forth herein.

149.    This claim for relief arises under 18 U.S.C. § 1964(c).

150.    Section 1962(c) of RICO provides that it "shall be unlawful for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity. . . ."

151.    As set forth above (particularly in ¶¶ 246-264) and in the succeeding paragraphs, Defendants have violated 18 U.S.C. § 1962(c) by conducting, or participating directly or indirectly in the conduct of the affairs of the HSBC Force-Placed Insurance Enterprise, through a pattern of racketeering acts indictable under 18 U.S.C. §§ 1341 and 1343 which resulted in injury to Plaintiffs and the Class.

152.    As a direct and proximate result, Plaintiffs and Members of the Classes have been injured in their business or property by predicate acts which make up the Defendants' pattern of racketeering activity as described herein.

### COUNT FOUR

### (ON BEHALF OF THE NATIONAL CLASS AND THE
### STATE SUBCLASSES AGAINST ALL DEFENDANTS)

### VIOLATION OF THE RACKETEER INFLUENCED AND
### CORRUPT ORGANIZATIONS ACT, 28 U.S.C. § 1962(D) – RICO CONSPIRACY

153.    Plaintiffs hereby incorporate by reference the preceding paragraphs as if they were fully set forth herein.

154.    This claim for relief arises under 18 U.S.C. § 1964(d).

155.    In violation of 18 U.S.C. § 1962(d), Defendants have, as set forth above (particularly in ¶¶ 246-264) conspired to violate 18 U.S.C. § 1962(c) by conducting, or participating directly or indirectly in the conduct of the affairs of the HSBC Force-Placed Insurance Enterprise.

156.    As a direct and proximate result, Plaintiffs and Members of the Classes have been injured in their business or property by predicate acts which make up the Defendants' pattern of racketeering activity as described herein.

## COUNT FIVE

### (ON BEHALF OF THE NATIONAL CLASS AND THE STATE SUBCLASSES AGAINST THE HSBC DEFENDANTS)

**BREACH OF FIDUCIARY DUTY/MISAPPROPRIATION OF FUNDS HELD IN TRUST**

157.    Plaintiffs hereby incorporate by reference the preceding paragraphs as if they were fully set forth herein.

158.    HSBC holds and/or controls funds in escrow; controls the establishment, funding requirements and maintenance of escrow accounts for the purposes of paying taxes, assessments, insurance premiums and other items set forth in borrowers' mortgages; and is obligated under the Mortgage to return any excess funds in accordance with the terms of the Mortgage.

159.    HSBC, as servicer of Plaintiffs' mortgages, has required payment of and/or accepted monies from Plaintiffs for Escrow Items identified in their Mortgage on a monthly basis and held them in Plaintiffs' escrow accounts. Similarly, HSBC, as the servicer of Plaintiffs' mortgages force-placing flood insurance, required payment therefore and deducted and/or charged the cost of the premiums to Plaintiffs' escrow accounts.

160.    HSBC was obliged to hold, manage and control these escrow funds in trust, and owed Plaintiffs and members of the Classes the highest fiduciary duty with respect to the handling of such funds.

161.    HSBC breached its fiduciary duty to Plaintiffs and the members of the Classes by, *inter alia*: (a) unilaterally using escrow funds to purchase force-placed insurance at a cost and in amounts that were inflated solely in order to generate additional profits for Defendants; (b)

profiting from unnecessary and excessive force-placed insurance policies that were purchased from escrow funds at the expense of Plaintiffs and members of the Classes; (c) unilaterally utilizing the escrow funds to pay for unnecessary and duplicative insurance for the purpose of increasing Defendants' profits; and (d) improperly depleting the escrow funds for unnecessary, unauthorized and duplicative flood insurance resulting in additional costs and injury to Plaintiffs and members of the Classes.

162.    These actions were undertaken by HSBC in bad faith solely for the benefit of Defendants and were not intended to benefit Plaintiffs or other borrowers.

163.    As a direct result of HSBC's actions and subversion of Plaintiffs' interests to Defendants' own interests in reaping additional, extravagant and unauthorized fees and profits, Plaintiffs and the Classes have suffered injuries in the form of unnecessary and excessive escrow charges, unnecessary and improper depletion of escrow funds intended for and properly allocated to other Escrow Items, a loss of funds from their escrow accounts and/or loss of equity in the property due to increases in the amounts due under the mortgage to cover escrow shortfalls.

164.    Plaintiffs and the Classes are entitled to all damages resulting from HSBC's breach of its fiduciary obligations and misappropriation of escrow funds.  In addition, Plaintiffs and the Classes are entitled to punitive damages because HSBC acted in bad faith in deliberate and/or reckless disregard of their rights and HSBC's obligation to hold their escrow funds in trust.

## COUNT SIX

### (ON BEHALF OF THE NATIONAL CLASS AND THE
### STATE SUBCLASSES AGAINST THE ASSURANT DEFENDANTS)

### AIDING AND ABETTING A BREACH OF FIDUCIARY DUTY

165.    Plaintiffs restate and incorporate the preceding paragraphs of the Complaint.

166.    HSBC breached its fiduciary duties to Plaintiffs and the Class as set forth hereinabove, including specifically as set forth in Count Five.

167.    The Assurant Defendants actively induced and/or participated in HSBC's breach of fiduciary duties through the conduct described hereinabove, including, but not limited to, offering HSBC the opportunity to reap additional profits and facilitating the realization of such profits through a scheme to force-place borrowers serviced by HSBC in unnecessary, duplicative and exorbitantly priced force-placed insurance and tracking services sold by the Assurant Defendants, in exchange for kickbacks, sham commissions, fees for sham services and "rebates" paid to HSBC.

168.    The Assurant Defendants actively induced and/or participated in HSBC's breach of fiduciary duties through the provision of tracking services that identified and implemented the force-placement of Plaintiffs and members of the Classes in unnecessary, duplicative and exorbitantly priced flood insurance and facilitated the billing and payment for such insurance.

169.    As a result if the breach of fiduciary duties to Plaintiffs and members of the Classes by HSBC that the Assurant Defendants induced and/or participated in as hereinabove described, Plaintiffs and members of the Classes suffered damages in the form of unnecessary and excessive escrow charges, unnecessary and improper depletion of escrow funds intended for and properly allocated to other Escrow Items, a loss of funds from their escrow accounts, and/or loss of equity in the property due to increases in the amounts due under the mortgage to cover escrow shortfalls.

170.    Plaintiffs and the Classes are entitled to all damages resulting from HSBC's breach of their fiduciary obligations and misappropriation of escrow funds and the Assurant

Defendants are liable for these damages by virtue of their conduct aiding and abetting HSBC's wrongful conduct.

## COUNT SEVEN

### (ON BEHALF OF THE NATIONAL CLASS AND THE STATE SUBCLASSES AGAINST ALL DEFENDANTS)

### DECLARATORY AND INJUNCTIVE RELIEF

171.   Plaintiffs hereby incorporate by reference the preceding paragraphs as if they were fully set forth herein.

172.   On each cause of action stated above, Plaintiffs and the Classes will be irreparably injured in the future by the Defendants' misconduct.

173.   Plaintiffs, on behalf of themselves and all members of the Classes, seek a judgment declaring that Defendants must cease the activities described herein, provide the Class with adequate remedies, including, without limitation, refunds and/or credits of all unfair, unlawful or otherwise improper force-placed insurance charges and provide for adequate procedures and policies to ensure that Defendants' unlawful conduct does not continue.  Such policies and procedures should include, without limitation, that Defendants: (a) are prohibited from force-placing insurance when the servicer knows or has reason to know that the borrower has a policy in effect that meets the minimum requirement of the loan documents; (b) cannot force-place insurance that is in excess of the lender's interest in the mortgaged property; (c) are prohibited from purchasing the force-placed insurance from a subsidiary, affiliate, or any entity in which they have an ownership interest; (d) must make reasonable efforts to continue or reestablish the borrower's *existing* insurance policy if there is a lapse in payment; and (e) must purchase any force-placed insurance for a commercially reasonable price.

174.   Plaintiffs and the Classes do not have a plain, adequate, speedy, or complete remedy at law to address the wrongs alleged in this Complaint, and will suffer irreparable injury as a result of the Defendants' misconduct unless injunctive and declaratory relief is granted.

175.   By reason of the foregoing, Plaintiffs and the Classes are entitled to declaratory and injunctive relief as set forth herein.

### COUNT EIGHT

### (ON BEHALF OF THE NATIONAL CLASS AND THE STATE SUBCLASSES AGAINST ALL DEFENDANTS)

### VIOLATION OF THE TRUTH IN LENDING ACT (15 U.S.C. § 1607)

176.   Plaintiffs hereby incorporate by reference the preceding paragraphs as if they were fully set forth herein.

177.   Residential mortgage loan agreements are subject to the disclosure requirements of the Truth in Lending Act ("TILA"), 15 U.S.C. § 1601 *et seq.*, and all related regulations, commentary, and interpretive guidance promulgated by the Federal Reserve Board.

178.   HSBC is a "creditor" as defined by the TILA.

179.   Under the TILA, HSBC is required to accurately and fully disclose the terms of the legal obligation between the parties. *See* 12 C.F.R. § 226.17(c)(1) ("The disclosures shall reflect the terms of the legal obligation between the parties."). This duty to make truthful and accurate disclosures is an ongoing duty, and applies to both subsequent disclosures and initial disclosures at the time of the loan transaction.

180.   HSBC violated TILA by misrepresenting to Plaintiffs and other Over-Insured Class members that they were required to purchase flood insurance in amounts greater than required under their mortgage agreements and greater than necessary to secure their outstanding principal balance.

181.    In addition, HSBC violated the TILA by, *inter alia*: (i) adversely changing the terms of mortgage loans after origination without consent and demanding more insurance than previously required in amounts greater than necessary to protect its interest in the property; and (ii) failing to provide proper notice, after origination, that HSBC was amending the terms of loans as described in the relevant mortgage documents.

182.    The TILA violations set forth above occurred within one year of the commencement of this action.  To the extent that the violations described above occurred earlier, Plaintiffs did not discover and did not have a reasonable opportunity to discover HSBC's violations.

183.    Plaintiffs' TILA claims are timely. The statute of limitations on the TILA claims did not begin to run and/or was equitably tolled until such time that Plaintiffs had a reasonable opportunity to discover HSBC's TILA violations and complain about such violations. It would be manifestly unjust and inconsistent with the purposes of TILA to apply and enforce an earlier accrual date for Plaintiffs' TILA claims.

184.    HSBC systematically and pervasively engaged in similar violations of TILA to the detriment of other members of the Over-Insured Class.

185.    Plaintiffs and the Citigroup Over-Insured Class have been injured and have suffered a monetary loss as a result of HSBC's violations of TILA.  Pursuant to the terms of Plaintiffs' form mortgage, the unauthorized charges for flood insurance were added to Plaintiffs' loan balances are accruing interest.

186.    As a result of HSBC's violations, Plaintiffs and the Over-Insured Class are entitled to recover actual damages and a penalty of $500,000 or 1% of HSBC's net worth, as provided by 15 U.S.C. § 1640(a)(1)-(2).

187.    Plaintiffs and the Over-Insured Class also are entitled to recovery of attorneys' fees and costs to be paid by HSBC, as provided by 15 U.S.C. § 1640(a)(3).

**COUNT NINE**

**(ON BEHALF OF THE COLORADO SUBCLASS AGAINST HSBC)**

**VIOLATION OF THE COLORADO CONSUMER PROTECTION ACT ("CCPA")
(COLO. REV. STAT. § 6–1–101, ET SEQ.)**

188.    Plaintiffs hereby incorporate by reference the preceding paragraphs as if they were fully set forth herein.

189.    HSBC was required to adhere to the requirements of the CCPA when conducting business with Weller and other Colorado Subclass members.

190.    Under the CCPA, "[a] person engages in a deceptive trade practice when, in the course of such person's business, vocation, or occupation, such person: such person . . . [m]akes false or misleading statements of fact concerning the price of goods, services, or property or the reasons for, existence of, or amounts of price reductions." Colo. Rev. Stat. § 6–1–105(1)(l).

191.    The CCPA further provides that "[a]n equity purchaser shall make no untrue or misleading statements of material fact regarding . . . any contract term, the home owner's rights or obligations incident to or arising out of the sale transaction, [or] the nature of any document that the equity purchaser induces the home owner to sign." Colo. Rev. Stat. § 6–1–1117(4).

192.    Throughout the class period, HSBC and its employees and agents have engaged in, and continue to engage in deceptive trade practices in the conduct of its business in the State of Colorado.

193.    Among other acts of deception, HSBC:

(a)     falsely represented that flood insurance was required on their property when flood insurance was not required;

(b)    falsely represented that flood insurance was required on their property in amounts greater than actually required by the lender, Fannie Mae and/or federal law;

(c)    falsely represented that the cost of force-placed flood insurance may be much higher than the amount borrowers would pay through the Federal Flood Insurance Program because force-placed flood coverage is provided without detailed underwriting or elevation information;

(d)    falsely represented that flood insurance was being force-placed in order to protect the lender's interest in the property when HSBC was in fact force-placing flood insurance to generate substantial; and

(e)    misrepresenting in their force-placed insurance notices that borrowers were obligated to pay for backdated insurance coverage for periods during which the lender had no risk of loss due to the passing of time and/or the lender's coverage under a "standard mortgage clause" and/or a Lender's Loss Payable Endorsement;

194.    Defendants utilized standard form mortgage contracts when contracting with Weller and the Colorado Subclass, who executed mortgage contracts with Defendants.

195.    The policies, acts and practices alleged herein were intended to result and did result in the payment of inflated premiums for force-placed insurance by Weller and the Colorado Subclass, which in turn were intended to generate unlawful or unfair kickbacks or commissions for Defendants.

196.    Specifically, HSBC had an exclusive relationship with its vendor and the preferred insurance carrier, whereby it would charge unreasonable and inflated prices for force-placed insurance policies to Weller and the Colorado Subclass, and would then receive a kickback or commission based on a percentage of the insurance policy's premium.

197.    Weller and the Colorado Subclass sustained damages as a direct and proximate result of HSBC's unfair or deceptive practices in that they were charged and/or paid for excessive and/or unnecessary force-placed flood insurance.

198.    HSBC's force-placed flood policy practices significantly impacts the public as actual or potential consumers of the HSBC's goods, services, or property.

### PRAYER FOR RELIEF

WHEREFORE, Plaintiffs request that this Court enter a judgment against Defendants and in favor of Plaintiffs and the Classes and award the following relief:

A.    That this action be certified as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure, declaring Plaintiffs as representatives of the Classes and Plaintiffs' counsel as counsel for the Classes;

B.    That the conduct alleged herein be declared, adjudged and decreed to be unlawful;

C.    An award of treble the amount of damages suffered by Plaintiffs and members of the Classes as proven at trial plus interest and attorneys' fees and expenses pursuant to 18 U.S.C. §§ 1962 (c) and (d);

D.    Compensatory, consequential, and general damages in an amount to be determined at trial;

E.    Costs and disbursements of the action;

F.    Restitution of all improperly collected funds and/or disgorgement of Defendants' ill-gotten gains, and the imposition of an equitable constructive trust over all such amounts for the benefit of the Classes;

G.    Pre- and post-judgment interest;

H.    Reasonable attorneys' fees; and

I.    Such other and further relief as this Court may deem just and proper.

## DEMAND FOR JURY TRIAL

Plaintiffs hereby demand a trial by jury as to all claims in this action.

Dated: January 25, 2013

Respectfully submitted,

**KESSLER TOPAZ**
**MELTZER & CHECK, LLP**

*Original signature on file at the offices*
*of Kessler Topaz Meltzer & Check, LLP*

Peter A. Muhic
Edward W. Ciolko
Peter H. LeVan, Jr.
280 King of Prussia Road
Radnor, PA  19087
Telephone: (610) 667-7706
Facsimile: (610) 667-7056

**NIX PATTERSON & ROACH, LLP**
Jeffery J. Angelovich
Michael B. Angelovich
Brad Seidel
205 Linda Drive
Daingerfield, TX  75638
Telephone:  (903) 645-7333
Facsimile:  (903) 645-4415

**KEIL & GOODSON, P.A.**
Matt Keil
John C. Goodson
406 Walnut Street
Texarkana, AR  71854
Telephone: (870) 772-4113
Facsimile: (870) 773-2967

*Attorneys for Plaintiffs*